## WHITE v. BROOKS.

A contract that W shall find timber and T shall manufacture it into shingles, and shall have 3,500 of every 5,000 manufactured, makes W the owner of three tenths of the shingles, and T of seven tenths of them; and, until some division is made, they become tenants in common of the shingles.

A tenant in common can not convey title, by a sale, to any more of the common property than he owns.

But if one tenant in common sells the whole of an article owned in common, or undertakes to do so, without the authority or consent of the other owner in common, that constitutes a wrongful act, which terminates the tenancy in common, and constitutes a conversion of the property. And the latter tenant may bring his sole action of trover against said former tenant in common, or he may waive the tort, ratify the sale, and bring his action of money had and received, for the money received by the defendant for the plaintiff's interest in such property.

And if a tenant in common thus wrongfully sells and converts the common property, and the purchaser again sells it for money, the other tenant in common may also bring his sole action of trover against such first purchaser, for the conversion, or he may waive the tort, and bring his action for money had and received, for the money received by such first purchaser from his vendee, for the plaintiff's interest in such property.

Tenants in common, while the tenancy continues, should join in trespass or trover for injuries to personal property thus owned in common, or in assumpsit for money received from a sale of their common property by a third person.

But in such case the non-joinder of the tenants, as plaintiffs, could only be taken advantage of by plea in abatement.

ASSUMPSIT. The plaintiff's declaration contained three counts: First, for goods sold and delivered, $200; second, for money had

and received, $200; third, upon an account annexed, as follows: namely,

1856–7.   To 30 M No. 2 W. pine shingles, @ $4.45 ℔ M,     $133.50
          15 M No. 3 do.,                                     55.50
          Interest,                                           12.00
                                                            _____
                                                             $200.00
                              Cr.:
By your store account to apply on said shingles,
    for goods delivered on the 25th February, 15th
    May, July 3d,                                             $65.15

          Balance,                                           $135.85

Plea, the general issue.   It appeared in evidence that the plaintiff and one Alfred Taylor, on the 16th day of December, 1856, made a contract in writing, as follows:

"Memo. between John H. White and Alfred Taylor.   Whereas said Taylor is now making shingles from the timber of said White, it is hereby agreed between us that said Taylor, for all the labor of getting the timber out of the woods and manufacturing the same into shingles, is to have three and one half thousands out of every five thousand manufactured; the remainder, being one and a half thousand out of every five thousand, said Taylor agrees to deliver to said White, of equal quality of his own of numbers, as they are made, on the John's River road, where the hill road intersects with the same.   The refuse bolts, not suitable for riving, said Taylor is to have for his own use.

                                                    ALFRED TAYLOR,
Lancaster, Dec. 16, 1856."                          JOHN H. WHITE.

In pursuance of said agreement, said Taylor employed a number of hands through the winter of 1856–7, and manufactured shingles from said White's timber, on a lot of land in Dalton; and all said shingles were hauled by said Taylor to the intersection of the roads specified in said contract, prior to February 6, 1857.   The amount charged to the defendants in the plaintiff's account annexed to his writ, is for three tenths of the shingles thus made and delivered by Taylor.   The defendants admitted that they had received these shingles of Taylor, and sold them to one Holmes, of Littleton, and received cash for the same.

It appeared that October 1, 1856, said Taylor made a contract with the defendants, in which he sold them all the shingles he had made or should make that fall or the coming winter, at a price agreed, to be delivered at the same place mentioned in the contract afterward made between White and Taylor.   The evidence was conflicting as to whether Taylor sold the whole of the shingles to the defendants, or only his interest in them, and notified them of White's interest and claim.

It appeared in evidence that, on or about the 6th of February, 1857, the plaintiff learned that the defendants were removing the shingles, they claiming that they had purchased them of Taylor,

under their contract with him; whereupon the plaintiff went to Dalton, and informed them that he was the owner of three tenths of the shingles which Taylor had made and hauled from his land, and that he should hold them responsible for them, and claimed that they should pay him for his shingles. The defendants said they had paid Taylor for them, and declined to pay again to him. The plaintiff told them there were more than fifty thousand shingles at the intersection of the roads at that time, and forbade their taking any more.

On the 26th of September, 1857, Taylor furnished White the following order:

"Messrs. O. M. & E. P. Brooks—Gentlemen: John H. White has claim on you for the pay for thirty thousand of No. 2 shingles, and fifteen thousand of No. 3 shingles, which you received of me last fall and winter, which were made from timber taken from his land.
ALFRED TAYLOR."

White presented this order to the defendants, and demanded payment thereon. On the 30th of September, Taylor having failed to comply with the terms of his contract with the defendants, they sued him for all advances, &c., and secured their debt by attachment of his property. This action was entered in court, and Taylor appeared, filed his plea and set-off, claiming all the shingles delivered as his property.

The defendants notified Col. White of the existence and character of the set-off. Mr. Pinkham was appointed auditor in the case. The plaintiff testified that he was willing to go before him with his proof, and abide by his decision as to the justice of his claim, and so informed the defendants, and he was to be notified of the time and place of hearing. But it appeared in evidence that, after the action had been in court for two or three terms, the defendants met Taylor and settled with him, without calling out the auditor or notifying the plaintiff. The defendants allege that they allowed his whole set-off to Taylor. It did not appear that the plaintiff had ever made any separation of the lumber, or that he had notice of the sale to Brooks, until about the 5th or 6th of February, when about 150 M, as the defendants say, had been sold and delivered to Holmes.

After the evidence was closed, the counsel for the defendants moved for a nonsuit on the following grounds: namely,

1. There is no privity between these parties by which an action can be sustained.

2. If assumpsit lies at all, it should be in the name of White and Taylor joined.

3. Assumpsit does not lie in the name of White alone.

4. White parted with his possession and right to the lumber under the contract, and was to receive his pay in shingles, delivered to him.

5. If the shingles were not delivered, he could only look to his contract for the delivery.

6. Brooks was an innocent purchaser for value.

7. White knew of this sale, and stood by till they were delivered

and paid for by Brooks, and is now estopped to claim them of the defendants.

The court overruled the motion of the defendant for a nonsuit, and charged the jury that the plaintiff might be regarded properly as a joint owner or tenant in common of the shingles in question; that he could be divested of his rights only by his own consent, or by operation of law; that mere possession of personal chattels, without some other evidence of property, or of authority from the owner to sell, will not enable the possessor to transfer a better title than he has himself; that it was proper for the jury to inquire whether the plaintiff had in any way surrendered his power of control, or voluntarily given authority to. Taylor, or any other person, to sell his part of the shingles; that, when delivered at the intersection of the roads, the ownership, equal to the interest of the plaintiff, remained in him, which drew after it the common legal right of possession, and that the sale by Taylor to the defendants was a conversion of the plaintiff's property; that it was competent for the plaintiff to waive the tort and maintain assumpsit, if the jury believed the plaintiff's property had been converted into money by the defendants, and a due demand had been made by the plaintiff before action brought.

The defendants excepted to the ruling and instructions of the court. The jury returned a verdict for the plaintiff, which the defendants moved to set aside; and the questions of law were reserved.

*Whidden,* for the defendants.

*Burns & Fletcher,* for the plaintiff.

SARGENT, J. The transactions in this case, taken in the order of time in which they occurred, were as follows: October 1, 1856, Taylor made his contract with the defendants to sell to them all the shingles he had made or should make that fall or the coming winter, to be delivered at the intersection of the roads.

December 16, 1856, White and Taylor made their contract for the manufacture of shingles, as stated in the case. The shingles were made by Taylor from timber of White's; and Taylor delivered not only White's part, but his own, at the intersection of the roads.

The defendants had drawn the larger part of these shingles away before February 6, 1857. About that time White first learned that the defendants were taking these shingles away; whereupon he went immediately to Dalton, and notified the defendants of his ownership in the shingles, and claimed pay for his share in them, and forbade their taking away any of the fifty thousand that remained, unless they paid him for them.

Afterward the defendants made certain arrangements with Taylor, to which the plaintiff was no party, nor did it appear that he had any knowledge of them; whereupon the defendants, prior to February 7, 1857, hauled all of the balance of the shingles away from the intersection of the roads; after which the plaintiff called at the defendants' store, and took up a bill of goods, February 25,

another, May 15, and the third, July 3, 1857, according to the credits given in the plaintiff's account.

On the 26th of September, 1857, Taylor gave to the plaintiff the order on the defendants, certifying that White was entitled to receive of them pay for the same amount claimed in this suit, which they had received of Taylor, which order White presented to the defendants, &c. And on the thirtieth day of the same September the defendants sued Taylor for their whole claim, and secured their debt by an attachment of his property. He filed in set-off the whole amount of the shingles. White was notified of Taylor's claim, and was ready to appear and sustain his claim; but the defendants settled with Taylor privately, without letting White know of it; and of course, after having been notified by White and Taylor both, of White's claim, if they chose to settle without White's knowledge, and allow all of Taylor's claim, White would not be prejudiced by it.

It appeared that the defendants had sold all these shingles to one Holmes, of Littleton, and received payment in full for them in cash. And the evidence tended to show that White never gave any authority to Taylor, or any body else, to sell his part of the shingles.

We do not here discover any fraud, or any such laches on the part of White, in asserting his claim, as estops him from making it here.

The question was submitted to the jury to find whether the plaintiff had in any way surrendered his power of control over the shingles, or had authorized Taylor, or any body else, to dispose of his part of them; and the jury, by their verdict, have negatived any such position. And the evidence tends to show certainly that he lost no time, after he received notice of the defendants taking his property, in notifying them and making his claim; and no question is made but that the jury have assessed the damages at the proper amount, if the plaintiff is entitled to recover at all. The jury have also found by their verdict, under the instructions given, that the plaintiff's property had been converted into money by these defendants, and that a proper demand was made on them for the same, before suit brought.

This leaves but two questions open for investigation: (1) Was the plaintiff a tenant in common in the ownership of the shingles when taken by the defendants, or had he only a claim on Taylor for a certain quantity of shingles, to be delivered at the place specified, which he can only enforce as against him? (2) If White was a tenant in common in the ownership of the shingles, can he maintain this suit upon the facts which the jury have found?

The first question depends upon the interpretation of the written contract between White and Taylor. This provides that, of the shingles made from White's lumber, Taylor shall have seven tenths for the making. That would, of course, leave the remaining three tenths belonging to White, wherever they might be. But the contract goes further, and provides that Taylor shall deliver the part which thus belongs to White, at a certain place. Taylor is at liberty to do what he pleases with his own seven tenths. Now this is not a sale of the timber by White to Taylor, and an agreement to

pay for the same in shingles, delivered at a certain place.; but the agreement is that Taylor shall have a certain share for the expense and labor of manufacturing, and that leaves the balance White's, who found the timber.

Had Taylor failed to deliver these shingles at the place agreed on, but left them in the woods where they were made, he would have been liable on that contract, not for the value or amount of the shingles at that place, but merely for the damage caused by his not drawing them to the place agreed on. Three tenths of these shingles being White's wherever they were, if Taylor sold them he simply undertook to sell White's property, although in common with his own. Taylor drew all the shingles to this place, as it seems, from choice, as this was the place where the defendants were to take them of him. Taylor having thus performed his contract, in manufacturing and hauling the shingles, White and Taylor were then owners in common of those shingles at the crossing of the roads, when the defendants took them. And the ruling of the court was correct upon that point, as it was also upon the other, that Taylor could not convey any greater interest than he owned; that he could not sell White's interest in them without his consent.

Can White, thus situated, maintain this suit?

In the case of a personal chattel, or of trees severed from the land, if one of two or more joint tenants or tenants in common by the sale thereof convert the same into money, the joint interest is determined, and each hath a separate interest for a sum certain, and may support an action for money had and received against the other. 1 Chit. Pl. 39 and 40. Here, then, if Taylor sold or undertook to sell the whole interest in the shingles to the defendants, that terminated the tenancy in common, and White could have brought *indebitatus assumpsit* against Taylor for his portion of the money; and the tenancy in common being terminated, White might also have followed his property into the hands of the defendants, and have maintained trover against them for the conversion of his property. But the defendants having sold the property and converted it into money, he may waive the tort and bring assumpsit for money had and received, to recover whatever the defendants have received upon a sale of the plaintiff's property, the plaintiff ratifying the sale and only asking the defendants to pay him the amount of money they have actually received for his property which they sold.

On the other hand, if Taylor only sold his interest in the shingles to the defendants, then they would have become tenants in common with the plaintiff, in the ownership of the property; and then selling the whole of the property in the shingles to Holmes, and receiving the money for them, would operate as a termination of the tenancy in common between them and White, and White could maintain his action of tort against them for such conversion of the property, or assumpsit for his portion of the money in their hands, hands, which arose from the sale of his property.

So it makes no difference here whether Taylor sold the whole property in the shingles to the defendants, or only his interest therein; there has been a termination of the tenancy in common, and a

conversion of the property in either case, and a sale of the same for cash, so that the plaintiff can maintain assumpsit.

One whose goods have been taken from him, or detained unlawfully, whereby he has a right to an action of trespass or trover, may, if the wrong-doer sell the goods and receive the money, waive the tort, affirm the sale, and have an action for money had and received for the proceeds. *Jones* v. *Hoar,* 5 Pick. 285, and cases cited in note; *Gardiner Manf. Co.* v. *Heald,* 5 Greenl. 381; *Chauncey* v. *Yeaton,* 1 N. H. 151; *Main* v. *Locke,* 11 N. H. 246; *Gilmore* v. *Wilbur,* 12 Pick. 120. The last case is cited by the defendants as an authority on which they rely, because it is there said that tenants in common must not only join in an action of tort for an injury to the common property, but that they must also join in an action of assumpsit where the tort is waived.

Now, there is no doubt about the correctness of this principle; the only trouble is in making it apply to the defendants' case. Suppose these defendants had taken all these shingles without purchasing them of either of the owners, and without their consent; then these owners in common must join in an action of trespass; they would also join in an action of trover for the conversion of the common property; and if the defendants, having obtained the property in that way, had sold the same, and converted it into money, the joint owners might waive the tort, and bring an action of money had and received, for the money thus received for their property, and in that action they must join. This is the doctrine of *Gilmore* v. *Wilbur.*

But that it has no application to this case is apparent from the fact that in this case there was first a severance of the tenancy in common, a termination of the common ownership, by the wrongful act of one of the tenants, in undertaking to sell, not only his own interest in the common property, but the whole property, without any authority to do so, from the joint owner. The tenancy in common being first terminated, by the act of the other owner in common, White has a sole action against the defendants, as though no tenancy in common had ever existed. *Selden* v. *Hickock,* 2 Caines 166; *Weld* v. *Oliver,* 21 Pick. 559.

The last case is in point here: It is there held that if personal property held in common be sold by one of the tenants, as exclusively his own, such sale is a conversion, and the co-tenant may maintain trover therefor against him, or he may, in case the purchaser shall also sell and deliver the property as his own, maintain trover against such purchaser for the subsequent conversion. Now if he could bring trover against either, under these circumstances, he could of course waive the tort and bring assumpsit for the money received, either against his former joint owner, or such subsequent purchaser; 3 Bouv. Institutes 672, sec. 35, 24; *Wilson* v. *Reed,* 3 Johns. 175; *Hyde* v. *Stove,* 9 Cow. 230; *Gilbert* v. *Dickinson,* 7 Wend. 449. Also, as bearing on the case, see *Lamine* v. *Dorrel,* 2 Ld. Raym. 1216; *Lindon* v. *Hooper,* Cow. 419; *Lightly* v. *Clouston,* 1 Taunt. 112; *Carr* v. *Dodge,* 40 N. H. 403.

But there is another reason why this position of the defendants can not avail them, that the action should have been in the name of White and Taylor, and that is, that such nonjoinder of plaintiffs could only be taken advantage of by plea in abatement. In this case it is too late to take that exception on trial. *Pitkin* v. *Roby*, 43 N. H. 138.

There must be judgment on the verdict.